UNITED STATES of America, Appellee,

v.

Eric ARIAS, Earl Lavell Faircloth, Gerald E. Michael, Idael Manuel Jimenez-Mora, Laten Gene Reaves, and Roger Suggs, Appellants.

Nos. 81–5133, 81–5134, 81–5135, 81–5136, 81–5137 and 81–5138.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1982.

Decided May 27, 1982.

Rehearing and Rehearing En Banc Denied June 29, 1982.

Joseph B. Cheshire, V, Raleigh, N. C. (Barbara A. Smith, Cheshire & Manning, Raleigh, N. C., on brief), for Arias & Jimenez-Mora.

James L. Nelson, Wilmington, N. C. (Nelson, Smith & Hall, Wilmington, N. C., W. Osborne Lee, Jr., Lee & Lee, Lumberton, N. C., on brief), for Reaves.

G. Eugene Boyce, Lacy M. Presnell, III, Raleigh, N. C., for Suggs.

John Richard Newton, Wilmington, N. C., for Faircloth.

Renn Drum, Jr., Winston-Salem, N. C., for Michael.

James L. Blackburn, Sp. Asst. U. S. Atty., Raleigh, N. C. (Samuel T. Currin, U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before WIDENER, HALL and CHAPMAN, Circuit Judges.

WIDENER, Circuit Judge:

Eric Arias, Earl Faircloth, Gerald Michael, Idael Jimenez-Mora, Laten Reaves and Roger Suggs were convicted in the United States District Court for the Eastern District of North Carolina on the three counts for which they were tried. The three counts were conspiracy to import and

to possess with intent to distribute methaqualone (quaaludes) and marijuana, in violation of 21 U.S.C. §§ 841(a), 952(a), 960(a)(1) and 963, and 18 U.S.C. § 2; importing the methaqualone and aiding and abetting the importation thereof, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), and 18 U.S.C. § 2; and importing the marijuana and aiding and abetting the importation thereof, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), and 18 U.S.C. § 2. We affirm in part, but reverse on one count of the convictions.

In the early morning hours of April 10, 1980, a Lodestar plane loaded with 3,310 pounds of marijuana and 867 pounds of quaaludes landed at an airport near Southport, North Carolina (called variously Southport and Long Beach Airport). A woman living by the airport had just before called the local police to say that she had seen and heard a plane having trouble landing.

In response to the call, Officer Pearson and Cadet Officer Russell of the Southport Police Department were sent to investigate. They testified that they approached the airport at a high rate of speed and, because of that, were forced to drive past the entrance, turn around and come back. They stated that they saw three vehicles at the airport entrance as they passed, but the vehicles were gone when they got back. The vehicles were a white Dodge van, a green and white fuel truck and a light-colored Buick Electra 225. The officers proceeded to look in the vicinity for the three vehicles they had seen, and spotted taillights in the distance and followed them. They belonged to the white Dodge van. Pearson radioed to Deputy Joyner of the Brunswick County Sheriff's Department to take over pursuit of the van. Joyner eventually stopped the van. Its occupants were identified as appellants Arias, Michael, Jimenez-Mora and Suggs. A consent search of the van yielded nothing.

Meanwhile, Pearson and Russell turned back toward the airport in search of the other two vehicles. They came across the Buick and the fuel truck traveling in the opposite direction. The officers turned and followed the fuel truck. They continued to follow the truck until a Deputy Campbell was requested to take over. Pearson and Russell returned to assist Joyner, who had stopped the white van.

Campbell turned onto the road where Pearson had last seen the fuel truck. A mile and a half up the road, he came across the fuel truck, the Buick, and another car stopped in the road. The fuel truck and Buick were occupied by three co-defendants whose cases are not before us on appeal. The owner of the fuel truck and Buick told Campbell that he had been called to the airport to refuel an airplane, which had never arrived. Campbell was given permission to search the fuel truck and the Buick. He found a canvas bag containing nine or ten white lights, some of which were still on.

While Campbell was questioning the occupants of the vehicles, he spotted two planes circling. He advised Pearson that he (Pearson) should go to the airport, and he later went there himself. The officers found the Lodestar plane on the runway with one engine running. Since no one was in the plane, one of the officers entered it to turn off the engine. He spotted plastic-wrapped bales of marijuana and boxes that seemed to contain tablets. The officers then contacted the Drug Enforcement Administration (D.E.A.) and customs officers.

Meanwhile, Officer Gates of the nearby Ocean Isle Police Department was dispatched to the Ocean Isle airport, after an air traffic controller reported that he had seen a plane flying in that direction. Officer Gates himself had observed a small, single-engine plane take off from Ocean Isle airport between an hour and two hours earlier. He had watched the plane as it intercepted a larger plane, and the two planes flew together toward Southport. When Gates arrived at Ocean Isle airport, a small plane was landing. Appellants Reaves and Faircloth got out of the plane and walked to their car. Gates engaged them in conversation until a back-up officer arrived. This officer, Chief of Police Gur-

ganeous, asked to see Faircloth's pilot's license and plane registration. Because Faircloth was unable to remove the registration from the plane, Gurganeous looked in to record the information contained therein. He observed that one of the four radios was set at a frequency of 122.5. The radio in the Lodestar plane that had landed at Long Beach airport was set at the same frequency, though this frequency is not normally used by planes in the vicinity of Ocean Isle and Long Beach.

The first issue raised on appeal is the claim that the rights of Reaves and Suggs were violated because they were represented at trial by the same attorney. Their principal claim in this regard is that since F.R.Cr.P. 44(c) requires the court to "inquire with respect to such joint representation and ... personally advise each defendant of his right to effective assistance of counsel, including separate representation," the mere failure of the district court to inquire and advise as set out in the rule makes necessary a reversal of the convictions. Admittedly, Reaves and Suggs were represented at trial by the same retained attorney, and, admittedly, no inquiry was made by the court. Reaves and Suggs were arraigned September 17, 1980. F.R.Cr.P. 44(c) became effective December 1, 1980, and the trial in the case was February 23, 1981. Nothing was said to the district court about Rule 44(c) at any time before the trial, during the trial, or even after the trial. The first time Rule 44(c) was mentioned in this proceeding was in the brief on appeal.

We are of opinion that the mere failure of the district court to inquire and advise in accordance with F.R.Cr.P. 44(c) does not make necessary a reversal. "The failure in a particular case to conduct a Rule 44(c) inquiry would not, standing alone, necessitate the reversal of a conviction of a jointly represented defendant." Notes of Advisory Committee on Rules, reprinted in West's Federal Rules of Criminal Procedure, etc., 1981 Ed., p. 117, 121. We decline to impose a rule of *per se* reversal contended for by the defendants.

Reaves and Suggs claim they were prejudiced by being represented at trial by the same attorney because such joint representation served to link them together in the eyes of the jury in this conspiracy case. This contention is obviously without merit, there being nothing in the record to support it. The same claim of guilt by association is made by the remaining appellants, which is likewise without merit for the same reason.

The only claim of prejudice worth mention on account of the joint representation is with respect to the testimony of a conversation Reaves had with one of the government agents. While the claim itself may be somewhat attenuated, we do not find it necessary to pass upon its validity because the matter was never brought to the attention of the district court. The conversation was admitted without objection, and no motion was made to strike it out. No difficulty occasioned by that testimony was mentioned to the district court. The very matter of joint representation, as we have related before, was never mentioned to the district court. Even at sentencing, when Suggs had a different attorney from the one who had represented him at trial, the matter was not brought to the district court's attention. We will not ordinarily notice error unless the matter has been brought to the attention of the district court. *McGowan v. Gillenwater*, 429 F.2d 586 (4th Cir. 1970). In this case, in which the mere violation of the rule is not reversible error, when the matter has not been brought to the attention of the district court, and when it is mentioned for the first time on appeal, we think it is not plain error, and decline to reverse the case or to inquire further into the matter under such circumstances. See F.R.Cr.P. 52(b).[1]

Appellants also contend that the van in which Michael, Arias, Suggs and Jime-

---

1. This opinion should not be considered a reflection on any of the trial attorneys for not objecting to the joint representation in the district court. The matter appears to be an afterthought.

nez-Mora were riding was illegally stopped and searched. Because no evidence was seized or introduced into evidence as a result of the search of the van, we do not decide whether the van was stopped illegally. Appellants claim that the identity of the van's occupants would never have been discovered had the van not been stopped. While this may be true, the identity of defendants is not suppressible under the exclusionary rule. The Supreme Court has held that the government is not prevented from bringing a defendant to trial merely because he was identified as a result of a false arrest, and we think that case controls here. *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

■ Error is assigned to admitting the testimony of the prosecution's expert witness. Dr. Franzosa, a forensic chemist and ballistics expert employed by the D.E.A., testified that he compared the quaaludes which were seized from the plane with a sample quaalude pill that he had received from an agent in Colombia. In his opinion, the seized quaaludes had been made by the same machine as the tablet from Colombia, and they could not have been made by any of the legitimate or illicit laboratories in the United States from which the D.E.A. had samples. The D.E.A. had samples from all legitimate laboratories in this country. Appellants protest that this testimony should not have been admitted because the government failed to establish a chain of custody for the sample sent from Colombia. In effect, they say, Dr. Franzosa's testimony was based on hearsay as to the origin of the sample tablet. Under F.R.E. Rule 703, however, an expert may base his testimony upon the type of hearsay he would normally rely upon in the course of his work. The sample pill was sent to Dr. Franzosa by a D.E.A. agent in Columbia in a heat sealed container by diplomatic pouch with the agent's identification thereupon. D.E.A. forensic scientists rely upon agents in the field to submit samples and to establish their authenticity as is shown by the fact that the pill in question was catalogued and kept for sample use by the D.E.A. Thus, Dr. Franzosa's reliance on the agent's report that the control sample was obtained in Colombia does not make his testimony inadmissible; rather, it is a factor to be considered by the jury in assessing the weight of his testimony, for it is not the fact of whether or not the sample pill came from Colombia which is at issue, the issue is whether Dr. Franzosa could use the sample pill in forming an opinion. We think its use was permissible under F.R.E. 703.

■ Also at issue is whether the evidence was sufficient to support the convictions for importation. The standard applied by this court in assessing the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Shaver*, 651 F.2d 236, 238 (4th Cir. 1981). The essential elements of importation that the government had to prove beyond a reasonable doubt are that the drugs were imported from outside the United States and that the defendants imported the drugs or aided and abetted in their importation.

The evidence which the government offers as tending to support the convictions for importation includes the testimony of Dr. Franzosa concerning the origin of the quaaludes; the words "This Side Up" in Spanish on the boxes in which the quaaludes were found; two batteries with Spanish writing, but no indication of origin, found in a flashlight in the Lodestar plane; and two telephone calls to Colombia made from a phone billed to Arias several days before the events of April 10, 1980.

The 3:30 a. m. airport possession of hundreds of pounds of Colombian quaaludes, as well as the Spanish-labeled flashlight batteries, must be an unusual occurrence in Southport, North Carolina and is entitled to more weight than courts have given to possession of similar items near the Mexican border. See *United States v. Miller*, 589 F.2d 1117, 1137 (1st Cir.), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771

(1978). The court in *Miller* distinguished cases from the Fifth and Ninth Circuits, including *United States v. Maslanka*, 501 F.2d 208 (5th Cir. 1970), *United States v. Carrion*, 457 F.2d 200 (9th Cir. 1972), and *United States v. Meyer*, 432 F.2d 1000 (9th Cir. 1970), partially on the infrequency of possession of Colombian marijuana in Maine compared with possession of foreign items common in the Southwest. *Id.*

We think the record supports an inference that appellants either imported the quaaludes or aided and abetted in their importation.

On the other hand, the convictions for importation of marijuana must be reversed for lack of evidence that the marijuana was imported. There is insufficient evidence in the record to connect the marijuana to a place outside the United States.

Count I of the indictment, the conspiracy count, actually consists of four items, conspiring to import quaaludes, conspiring to import marijuana, conspiring to possess quaaludes with intent to distribute, and conspiring to possess marijuana with intent to distribute. The guilt of the defendants may be established by any proof of one of the four items just mentioned. *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970). Three of the four items have been proved: conspiring to import quaaludes, conspiring to possess quaaludes with intent to distribute, and conspiring to possess marijuana with intent to distribute. Conspiring to import marijuana has not been established.

Count II of the indictment, importing the quaaludes and aiding and abetting the importation thereof, has been established by the evidence.

Count III of the indictment, importing the marijuana and aiding and abetting the importation thereof, has not been established by the evidence.

Accordingly, we affirm the convictions of the defendants on Counts I and II. Their convictions on Count III must be vacated.

Some part of the guilt of the defendants may be laid to the importation of marijuana which was a part of the charge in Count I and the essence of the charge in Count III. The sentences of the defendants consist variously of consecutive terms on all counts; consecutive and concurrent terms on different counts; a consolidated sentence; fines for some; § 4205(b)(2) sentences; and special parole terms for some. For these reasons, we believe that, although the convictions of all of the defendants on Counts I and II are affirmed, their sentences on Counts I and II must be vacated and that they ought to be resentenced by the district court.

On remand, the district court will vacate the convictions of the defendants on Count III and resentence the defendants on Counts I and II.

We have examined the other assignments of error presented and are of opinion they are without merit.

AFFIRMED IN PART; REVERSED IN PART; and REMANDED WITH INSTRUCTIONS.

HALL, Circuit Judge, concurring in part and dissenting in part:

While I concur with most of the majority opinion, I dissent from the reversal of the convictions for importation of marijuana.

In determining the sufficiency of the evidence to support the convictions, we must allow the government the benefit of all reasonable inferences from the facts proven. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Grow*, 394 F.2d 182 (4th Cir.) *cert. denied*, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968).

In this case, the marijuana was found on board the Lodestar together with boxes of quaaludes. As Judge Widener has outlined, the evidence indicated that the quaaludes were imported from Colombia. From this evidence, the jury could have inferred beyond a reasonable doubt that the rest of the Lodestar's cargo, including the marijuana, was similarly imported.

Accordingly, I would affirm the convictions for importation of the marijuana.