792 So.2d 104 (2001)
STATE of Louisiana
v.
Ransom P. MILLER and Douglas Mouton.
No. 2000-KA-0218.
Court of Appeal of Louisiana, Fourth Circuit.
July 25, 2001.
*107 Mary Constance Hanes, Louisiana Appellate Project, New Orleans, LA, Attorney for Defendant/Appellant, Ransom Miller.
*108 Bruce W. Harris, New Orleans, LA, Attorney for Defendant/Appellant, Douglas Mouton.
Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA.
Court composed of Judge MIRIAM G. WALTZER, PATRICIA RIVET MURRAY and TERRI F. LOVE, Judges.
WALTZER, Judge.
Defendants, Ransom Miller and Douglas Mouton, appeal their convictions and sentences for distribution and possession of marijuana.

STATEMENT OF THE CASE
On 7 October 1998, appellants Ransom Miller and Douglas Mouton were charged in a two-count bill of information. Both appellants were charged in count one with distribution of marijuana. Only Miller was charged in count two with possession of marijuana with intent to distribute. On 14 December 1998, a motion to suppress evidence was denied as to both appellants. At trial on 21 January 1999, a jury found appellant Miller guilty as charged on both counts and appellant Mouton guilty as charged on count one.
After several continuances, most of them by joint motion, on 20 October 1999, appellant Mouton pled guilty to a multiple bill and was sentenced as a second offender to twenty-five years at hard labor to run concurrently with any other sentence. Appellant Miller was sentenced to twenty-five years at hard labor. He then pled not guilty to the multiple bill. On 21 August 2000, the court adjudicated Miller to be a second offender, vacated the previous sentence, and "re-sentenced" the appellant on count one to twenty-five years at hard labor under the Habitual Offender Statute, to run concurrently "with any and all other sentences imposed in this case."

STATEMENT OF THE FACTS
On the evening of 29 September 1998, Det. Michael Harrison and Det. Adam Henry were working undercover in the French Quarter when they were approached by Douglas Mouton. The officers pretended to be tourists from Baton Rouge. Mouton offered to get them whatever they needed. The officers played "word games" with Mouton for a little while. He offered to find them girls or various drugs. When he mentioned "weed," they told him that is what they had in mind. The officers then followed Mouton through a circuitous route of about three blocks in the Quarter until they ended up in front of the Double Play Bar in the 500 block of Dauphine Street, around the corner from where they started.
At that point, Mouton told the officers to give him twenty dollars, and he would get them some weed. Det. Henry gave Mouton a pre-recorded twenty-dollar bill. Mouton went into the bar, walked over to appellant Ransom Miller, had a brief conversation with him, then gave Miller something, apparently the twenty-dollar bill.
Mouton then walked out of the bar and spoke to Det. Henry, who was waiting outside. He gave Det. Henry a ten-dollar bill and told him to give it to the man who would be coming outside next, and who would give him the marijuana. Det. Henry asked about the other ten dollars. Mouton told him that he was keeping that as his finder's fee.
Miller came outside a few minutes later. Det. Henry gave Miller the ten-dollar bill, and Miller gave the officer a small bag of marijuana. Miller also gave Det. Henry a card with his phone number on it. Miller told Det. Henry to call that number whenever he came to town and that he would get him whatever he needed. Miller then went back into the bar. Mouton and *109 Det. Harrison were on the other side of the street when the exchange took place. After the exchange, Mouton waved and walked on his way.
Dets. Henry and Harrison signaled to other undercover officers, who arrested Miller in the bar and Mouton on the street. The arresting officers took instant photographs of the suspects so that Dets. Henry and Harrison could confirm that the other officers arrested the correct individuals.
Dets. Henry and Harrison testified as to the exchange with Miller and their interaction with Mouton that led to the exchange. Sgt. Patrick Brown testified that, immediately prior to the patrol, he photographed five twenty-dollar bills and gave them to Det. Henry for use should he have the occasion to make an undercover buy. Sgt. Brown further testified that he observed Mouton come out of the bar and hand something to Det. Henry, and saw Det. Henry make an exchange with Miller. Sgt. Brown also did what he called "a lousy job" of searching Miller upon Miller's arrest. In addition to the pre-photographed twenty-dollar bill which Miller received from Mouton, Sgt. Brown found Miller to be in possession of another sixty-nine dollars in currency and two hand-rolled marijuana cigarettes.
Deputy Sheriff George Green, Jr., searched Miller again when he was processed at Central Lock-up. Green found fifteen small bags of marijuana in Miller's shoes. The parties stipulated that the small bag received by Det. Henry, the two hand-rolled cigarettes, and the fifteen bags found in Miller's shoes, all contained marijuana. Officer Clarence Gillard searched Mouton upon arrest and found him in possession of a ten-dollar bill and no contraband.
Mouton testified that he was just acting as a tour guide and looking for somebody to scam. He further testified that he thought the officers were looking for girls. He testified that he did not know Miller and did not speak to him in the bar. Rather, he alleged that he had the bartender exchange the twenty-dollar bill for two tens, so that he would get a ten-dollar tip for his tour of the Quarter. On cross-examination, Mouton admitted two prior convictions for possession of cocaine, one for simple robbery, one for aggravated assault and one for simple battery.
Miller testified that he did not know Mouton and did not accept any money from him. He further testified that he worked as a doorman for the R and B Club. He could not explain how he came into possession of the pre-recorded twenty-dollar bill, suggesting that the officers might have switched it with his own money. On direct examination, Miller admitted three prior convictions for possession of marijuana. He testified that he used marijuana to help him keep his food down because he was dying of AIDS. He testified that the quantity of marijuana he had in his shoes was about a two-week supply. He testified that he bought his marijuana in large quantities and got a bulk rate. He denied selling drugs. On cross-examination, Miller also admitted convictions for crime against nature and simple burglary.
The bags of marijuana, the hand-rolled cigarettes, the photograph of the pre-recorded bills, the currency found on the appellants and the business card which Miller gave to Det. Henry were all admitted into evidence.

ERRORS PATENT REVIEW (MILLER ASSIGNMENT ONE)
Miller assigns as error that he was convicted on two counts but sentenced on only one. This assignment has merit. Miller was convicted in count one of distribution of marijuana. He was convicted in count two of possession with the intent to distribute *110 marijuana. On 20 October 1999, the trial court noted the prior offenses alleged by the state in the multiple bill against Miller, then noted the latest conviction, in which a jury found him guilty of "possession with the intent to distribute marijuana." The court proceeded to sentence Miller to twenty-five years at hard labor. He then accepted a plea of not guilty to the multiple bill and set the matter for hearing. The trial court thus imposed only one sentence, for the conviction for possession with the intent to distribute marijuana, count two of the original bill of information.
At the multiple bill and sentencing hearing on 21 August 2000, the state proved up only one of the three predicate offenses alleged in the multiple bill, CDC # 382-500, a second offense possession of marijuana.[1] The multiple bill indicates that the state sought an enhanced sentence for "distribution of marijuana," which was count one of the original bill of information. Based upon the fingerprint evidence, the court found the appellant to be a second offender. He then vacated and set aside the previous sentence and sentenced the appellant to serve twenty-five years at hard labor, "to be served concurrently with any and all other sentences imposed in this case."
The multiple bill sentence can only apply to the conviction named in the multiple bill of information, the count one distribution conviction. The trial court noted only the count two possession with intent conviction in the original sentencing. Following the multiple bill adjudication, the court "vacated and set aside" the sentence "imposed in this case on the 20th day of October, 1999." A strict reading of both transcripts would permit the multiple bill sentence to stand, applied to count one conviction for distribution. However, the case is remanded for sentencing on count two, the possession with intent to distribute, due to the court's apparently inadvertent vacating of the sentence imposed on that count.[2]
There were no other errors patent.

MILLER ASSIGNMENTS TWO, THREE AND FOUR
By these assignments Miller argues that he was denied effective assistance of counsel by the failure of counsel to file or make a motion to reconsider the sentence or to present a defense at the sentencing proceedings, and that the trial court erred by imposing an excessive sentence.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Reed, 483 So.2d 1278 (La.App. 4 Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Garland, 482 So.2d 133 (La.App. 4 Cir. 1986).
A defendant's claim of ineffective assistance of counsel is to be assessed by *111 the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir.1992).
An appellate court reviews sentences for constitutional excessiveness under LSA-Const. Art. I, § 20. A sentence is constitutionally excessive it if makes no measurable contribution to acceptable goals of punishment or is the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime. Courts have the power to declare a sentence excessive even if it falls within the statutory limits. State v. Sepulvado, 367 So.2d 762 (La.1979).
LSA-C.Cr.P. art. 881.1 provides that the state or the defendant must make or file a motion to reconsider the sentence at or within thirty days of sentence to preserve an objection to the sentence for appellate review. In order to preserve specific sentencing grounds for review, a party must articulate the grounds in a motion to reconsider filed for the trial court's consideration. However, a simple objection to the sentence is sufficient to preserve appellate review on the grounds of excessiveness. State v. Minis, 619 So.2d 1059 (La.1993). Thus, the trial court's note of an objection to the sentence is sufficient to preserve the appellant's claim of excessiveness.
As to the failure of counsel to present any defense to the sentence, the appellant fails to suggest what defense sentencing counsel might have suggested. At the first sentencing, the trial court noted Miller's three prior convictions for possession of marijuana and one for crime against nature.[3] In addition, the trial court knew, from the facts of this case, that the appellant was a known drug dealer, in that his co-defendant sought him out for a potential customer. Lastly, the trial court was aware from the trial proceedings that the appellant alleged he was dying of AIDS.
In State v. Lee, 96-2392 (La.App. 4 Cir. 8/13/97); 699 So.2d 461, the district court deviated from the mandatory minimum sentence because the trial court record contained a letter from the Louisiana Health Care Authority acknowledging that the defendant was HIV positive. This court affirmed the conviction but vacated the sentence and remanded for re-sentencing. The court declined to consider the HIV positive medical condition as a mitigating *112 factor for sentencing purposes "because of the defendant's long and serious criminal and anti-social history." The court further noted:
Status as HIV positive is not a legislatively recognized mitigating factor for sentencing or for deviation from the mandatory minimum sentence prescribed under the Habitual Offender Law. Although we sympathize with the defendant, the state, through the Department of Corrections, has established medical policies and procedures to manage and support these prisoners. Because HIV and AIDS are prevalent in prisons today, reasonable and compassionate policies for the management of prisoners as they progress through the stages of this disease exist.
State v. Lee., 96-2392, p. 8 (La.App. 4 Cir. 8/13/97); 699 So.2d 461, 465.
More recently, in State v. Alford, 99-0299, p. 14 (La.App. 4 Cir. 6/14/00); 765 So.2d 1120, 1128, this court refused to reduce a mandatory life sentence for an appellant who had been HIV positive for four years and had developed AIDS, noting that the defendant failed to present substantial evidence to show by clear and convincing evidence that his sentence of life in prison without benefit of parole, probation, or suspension of sentence, under the Habitual Offender statute, was unconstitutionally excessive.
Miller was sentenced to twenty-five years at hard labor. The statutory range for his offense, as a second offender under the multiple bill, is fifteen to sixty years at hard labor. LSA-R.S. 40:966B(2), LSA-R.S. 15:529.1A(1)(a). The sentence imposed is thus less than half the maximum possible sentence. The appellant fails to allege any additional circumstance counsel might have argued at sentencing that would have persuaded the trial court to impose a lower sentence or persuaded this court that the sentence imposed is excessive. Accordingly, the sentence imposed is not excessive, and the appellant was not prejudiced by any failures or omissions of counsel at the multiple bill adjudication and sentencing.

MOUTON ASSIGNMENT ONE
Mouton argues that the trial court erred by accepting his plea to the multiple bill when the state failed to place evidence in the record to confirm that he was represented by counsel and advised of his constitutional rights before tendering his plea to the predicate offense. Particularly, the appellant notes that the trial court never asked him if he was the person convicted of possession of cocaine, the predicate charged in the multiple bill.
The transcript of the 20 October 1999 hearing indicates some initial confusion as to the predicates. The trial court read from a multiple bill which indicated two predicates for simple possession of cocaine and one for simple robbery. Miller advised the court that he had no predicate for simple robbery. At that point, the prosecutor advised that the wrong name was on the bill, and that the predicate offenses read by the court were perpetrated by Mouton. The trial court then noted that he had been advised by counsel for Mouton of a plea agreement with the state. By that agreement, the state would charge the appellant as a second offender, with a sentencing range of fifteen to sixty years, instead of a fourth offender with a mandatory life sentence, and the appellant would plead guilty to the multiple bill. The multiple bill filed that date against Mouton indicates a predicate conviction for possession of cocaine. As noted above, the appellant admitted two prior convictions for possession of cocaine, one for simple robbery, another for aggravated assault and simple battery during his trial testimony.
*113 The trial court noted the appellant's initials and the signature of appellant and counsel on the multiple bill waiver of rights form. The court then orally advised the appellant of his rights under the Habitual Offender Law, including his right to remain silent and require that the state prove the charges alleged in the bill. The court further advised that, considering the appellant's criminal history, he would be sentenced to twenty-five years at hard labor under the multiple bill. The sentence was also indicated in the fully executed waiver of rights form. The appellant acknowledged that he understood the rights explained to him by his counsel and the court, and waived his right to a hearing. The court then sentenced the appellant to twenty-five years at hard labor.
Mouton's guilty plea to the multiple bill bars him from raising a claim that the state did not produce sufficient evidence at the multiple offender hearing. State v. Merschal, 499 So.2d 360 (La.App. 4 Cir.1986). This assignment is without merit.

MOUTON ASSIGNMENT TWO
Mouton argues that the trial court erred in its failure to advise him and his co-defendant of the dangers of joint representation and its failure to ascertain that the defendants understood that a conflict could arise during the trial. This issue was addressed in State v. Smith, 98-2078, p. 5 (La.10/29/99); 748 So.2d 1139, 1142, as follows:
Because joint representation of co-defendants by the same counsel "is not per se violative of the constitutional guarantees of effective assistance of counsel," Holloway v. Arkansas, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978), the court in this case remained free to assume from the lack of notice by the defendants either that no conflict existed, or that they had accepted the risk of any conflict which did exist, unless circumstances were such that the court knew or should have known that a particular conflict existed. Cuyler v. Sullivan, 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980). In the absence of such special circumstances, or timely notice of a conflict, the defendants have the burden of showing post-verdict that an actual conflict existed which adversely affected counsel's performance. Cuyler, 446 U.S. at 349, 100 S.Ct. at 1718.
In Smith, the court noted that the trial of the case occurred before the effective date of 1997 La. Acts 889, which added art. 517 to the Code of Criminal Procedure and placed an affirmative duty on Louisiana trial judges to inquire with respect to the joint representation and advise each defendant on the record of his right to separate representation.
As noted by counsel, trial of the instant case occurred after the effective date of LSA-C.Cr.P. art. 517. Counsel argued orally that LSA-C.Cr.P. art. 517 is directly based on the constitutionally guaranteed right to counsel under the Sixth Amendment of the United States Constitution. Because the judge failed to advise the defendants of their individual and distinct right to counsel, appellate counsel asserts that trial strategy was severely impacted by trial counsel's representation of both defendants because counsel's joint representation prevented him from being faithful and conflictfree to either one.
LSA-C.Cr.P. art. 517 was enacted by recommendation of the Louisiana Law Institute. Paragraph (a) of the Official Comments states that it "effects a change in the law by requiring that the trial court, in the case of a joint representation of co-defendants, advise jointly charged defendants, who will be jointly tried and jointly *114 represented, of their right to `separate representation'". Paragraph (b) notes the long-standing rule that, when counsel moves for appointment of separate counsel, the trial court must conduct an inquiry into the matter so that conflict-free representation will be provided. The comments further note that the burden is on the defendant in post-conviction relief, and that the purpose of Article 517 is "to avoid such difficulties by requiring that the trial court initiate an inquiry whenever the possibility of such conflict arises due to joint representation of co-defendants." The comments acknowledge that the rule is based on F.R.Cr.P. 44(c) "and imposes an independent duty on the trial court to advise the defendant of his right to conflict-free representation."
The question arises as to what happens after the defendant(s) are advised under Art. 517 or if the trial court fails to do so. The Official Comments, paragraph (c), states that the "appropriate response to joint representation is not spelled out, but rather is left to the sound discretion of the trial court." The comments set forth several possibilities, including that "the judge may be satisfied that there is no possibility of a conflict of interest." This appears to be an acknowledgement of the well-accepted rule that a defendant is entitled to appointment of effective counsel if indigent, but not necessarily counsel of his choice. Thus, if no conflict exists, the trial court is not obliged to indulge a defendant's desire for different counsel.
A review of F.R.Cr.P. 44(c) and jurisprudence interpreting it appears to support the concept that advising a defendant of the right to separate counsel is not meant to give a defendant any new constitutional right. First, Rule 44(c) requires that "the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation." (emphasis added). According to the comments following Rule 44(c), the requirement of advising the defendants who are jointly represented is designed to avoid post-conviction claims arising from the denial of the Sixth Amendment right to the effective assistance of counsel. However, failure to advise the defendants pursuant to Rule 44(c) will not automatically require a reversal of a conviction. See United States v. Holley, 826 F.2d 331 (5th Cir.1987), cert. denied 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422, citing United States v. Benavidez, 664 F.2d 1255, (5th Cir.1982), cert. denied 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1352:

Benavidez instructs that the goal of Rule 44(c) is to prevent conflicts that may be associated with joint representation. "The inquiry and advice provided by that rule are not ends in themselves; they are a procedure designed to prevent conflicts of interest." (Citation omitted) Evaluating the trial court's compliance with Rule 44(c) thus cannot be divorced from a showing that the defendant has been denied his sixth amendment right to effective counsel. "If there is no actual conflict, then the rule's purpose will not be served by reversal of a conviction." Benavidez, 664 F.2d at 1258.
Holley, 826 F.2d at 333. The court in Holley further stated that although it did "not condone the trial court's omission of its duty, .... careful government counsel should ordinarily wish to draw a court's attention to Rule 44(c)." Id. This language confirms that Rule 44(c), and by analogy Article 517, are strictly procedural vehicles to lessen the possibility that after conviction a jointly-represented defendant will assert a claim that his counsel was not conflict-free and thus was ineffective. *115 Failure to have advised the defendant will not automatically result in the success of such a claim, but arguably having advised the defendant will it make less likely that such a claim will be raised.
Accordingly, the failure of the trial court to inquire into the joint representation on the record does not rise to the level of a denial of a constitutional right.[4] Moreover, because no objection was made prior to trial and no motion for separate counsel was made because of counsel's perceived conflict the violation was waived. LSA-C.Cr.P. art. 841A.
In the instant case, the record indicates no actual conflict by counsel. Each appellant testified that he did not know the other, and that he did not speak to the other on the night of the offense. Although the jury found neither appellant credible, this was not due to a conflict of counsel, but rather the incredibility of the testimony presented. Mouton fails to suggest any alternative defense he might have employed with separate counsel. Accordingly, this assignment is without merit.

MOUTON ASSIGNMENT THREE
Mouton argues that the evidence was insufficient to sustain the conviction for lack of proof that he had the requisite intent to be a principal in the distribution. The standard of appellate review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A credibility determination is within the discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La. 1984).
In general, criminal intent is present when the circumstances of the crime indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. State v. Cinel, 94-0942 (La.11/30/94); 646 So.2d 309, rehearing denied certiorari denied, 516 U.S. 881, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995).
Mouton was convicted, as a principal, to distribution of marijuana. A person who aids and abets in the commission of a crime, or counsels or procures another to commit a crime, is a principal. LSA-R.S. 14:24. To be convicted as a principal, a person must have the intent required by the statute prohibiting the crime charged. State v. Spotville, 583 So.2d 602 (La.App. 4 Cir.1991), writ denied, 585 So.2d 577 (La.1991). The prohibiting statute, LSA-R.S. 40:966A(1), provides that the act be intentional, but provides no additional qualifying provisions to the term "intentional." It is thus a general intent crime. LSA-R.S. 14:10, 14:11.
"General intent" exists when circumstances indicate that the prohibited *116 result may reasonably be expected to follow from the offender's voluntary act, irrespective of any subjective desire on the offender's part to have accomplished the result. State v. Elzie, 343 So.2d 712 (La. 1977). Though intent is a question of fact, it need not be proven as a fact; but may be inferred from the circumstances of the case. State v. Phillips, 412 So.2d 1061 (La.1982).
The facts adduced at trial indicate that Mouton approached undercover officers, believing that they were tourists, and offered to help them find whatever they needed. He established that they wanted marijuana, walked them around the block, then took a twenty-dollar bill from Det. Henry for the purpose of purchasing marijuana for him. He went inside a bar, spoke to Miller, gave Miller the pre-recorded bill, and came out with two tens. He gave Det. Henry a ten and told him to use it to purchase the marijuana from the person who would be coming outside after him. He kept the other ten as his finder's fee. He observed the transaction between Miller and Det. Henry from across the street, then walked away. A fact-finder could certainly believe, beyond a reasonable doubt, that Mouton had the intent to participate, with Miller, in the distribution of marijuana.
This assignment is without merit.

MOUTON ASSIGNMENT FOUR
Mouton argues that the trial court imposed an illegal and unconstitutionally excessive sentence and failed to comply with LSA-C.Cr.P. art. 894.1 by stating the considerations for his sentence. A defendant who receives a sentence in conformity with a plea agreement set forth in the record at the time of the plea is prohibited from seeking review of the sentence. LSA-C.Cr.P. art. 881.2A(2). State v. Small, 97-2470 (La.App. 4 Cir. 11/19/97); 702 So.2d 1200, writ denied, 97-3150 (La.4/9/98); 717 So.2d 1143; State v. Neville, 95-0547 (La.App. 4 Cir. 5/16/95), 655 So.2d 785, writ denied, 95-1521 (La.9/29/95); 660 So.2d 851.
At Mouton's multiple bill and sentencing hearing, the trial court noted that, in exchange for a guilty plea to the multiple bill, the state agreed to multiple bill the appellant as a second offender rather than a fourth offender. The trial court then advised that he would impose a sentence of twenty-five years at hard labor as a second offender. Mouton was fully advised of the terms of the plea agreement and his rights under the Habitual Offender statute. He further admitted that he had initialed and signed the multiple bill waiver of rights form, which indicated the twenty-five-year sentence. Accordingly, Mouton has no right to appellate review of his sentence.

CONCLUSION
We affirm the convictions. We affirm the sentence of Mouton and the multiple bill adjudication and the sentence imposed on Miller on count one. However, we remand for re-sentencing of Miller on count two.
CONVICTIONS AFFIRMED, MOUTON'S ADJUDICATION AS AN HABITUAL OFFENDER AFFIRMED AND SENTENCE AFFIRMED, AND MILER'S SENTENCE AFFIRMED AND CASE REMANDED FOR SENTENCING ON CONVICTION FOR POSSESSION WITH INTENT TO DISTRIBUTE.
NOTES
[1] For whatever reason, the state made no attempt to prove up the other predicates at the hearing.
[2] The 20 October 1999 minute entry indicates that the trial court sentenced appellant Miller to twenty-five years at hard labor on each count, to run concurrently. However, no such language is found in the transcript. Where there is a conflict between the minute entry and the transcript, the transcript controls. State v. Jones, 557 So.2d 352 (La.App. 4 Cir.1990); State v. Beard, 547 So.2d 7 (La. App. 4 Cir.1989).
[3] The multiple bill indicates priors for second offense possession and third offense possession because they are felonies. Implicit in the convictions for the second and third offense is that there was also a first offense, which would have been a misdemeanor and thus not applicable as a predicate for a multiple bill.
[4] In a published opinion this Court considered en banc the question whether the failure of the trial judge to comply with LSA-C.Cr.P. art. 517 rises to a denial of a constitutional right. The requisite majority of the judges of this Court held that the failure of the trial judge to so advise the multiple defendants was subject to a harmless error review. State v. Holmes, Bowie & Bailey, 99-0898, (La.App. 4 Cir. 11/08/00), 791 So.2d 669. Likewise, the instant case was submitted for consideration to the judges en banc with the same result.